UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>GARY ALAN PORRETT and<br>JENNIFER SUE PORRETT,<br><br>Debtors. | Bankr. Case No. 09-03881-JDP |
| GARY ALAN PORRETT and<br>JENNIFER SUE PORRETT,<br><br>Appellants,<br><br>vs.<br><br>NOAH G. HILLEN, chapter 7<br>Trustee for the estate of Garry A.<br>Porrett and Jennifer S. Porrett,<br><br>Appellee. | District Case No. 1:16-CV-00135-MWB<br><br>**APPELLEE'S EXCERPTS<br>FROM RECORD** |

Noah G. Hillen, ISB No. 7690
CHAPTER 7 BANKRUPTCY TRUSTEE
P.O. Box 6538
Boise, Idaho 83707
Telephone: (208) 297-5774
Facsimile: (208) 297-5224
Email: ngh@hillenlaw.com
*Attorney For Chapter 7 Bankruptcy Trustee*

Patrick J. Geile, ISB No. 6975
Matthew G. Bennett, ISB No. 9499
FOLEY FREEMAN, PLLC
P.O. Box 10
Meridian, ID 83680
Telephone: (208) 888-9111
Facsimile: (208) 888-5130
Email: pgeile@foleyfreeman.com
*Attorneys for Gary Alan Porrett and
Jennifer Sue Porrett*

## <u>TABLE OF CONTENTS</u>

| Tab | Date Filed | Bankruptcy Court Docket | Description | Pages |
|---|---|---|---|---|
| 1 | July 31, 2015 | Dkt. No. 50 | Motion to Approve Compromise Under Fed. R. Bankr. P. 9019 | 1-10 |
| 2 | September 18, 2016 | Dkt. No. 56 | Order Granting Motion to Approve Compromise Under Fed. R. Bankr. P. 9019 | 11-14 |
| 3 | January 20, 2016 | Dkt. No. 59 | Joint Motion for Determination of Property of the Bankruptcy Estate | 15-19 |
| 4 | January 20, 2016 | Dkt. No. 60 | Join Statement of Undisputed Facts and Stipulation Regarding Admission of Exhibits | 20-53 |
| 5 | March 10, 2016 | Dkt. No. 68 | Memorandum of Decision | 54-77 |
| 6 | March 17, 2016 | Dkt. No. 69 | Order Regarding Joint Motion for Determination of Property of the Bankruptcy Estate | 78-80 |

Dated:  July 12, 2016

/s/ Noah G. Hillen
Chapter 7 Bankruptcy Trustee

**APPELLEE'S EXCERPTS FROM RECORD - 2**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 12, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Patrick John Geile**
pgeile@foleyfreeman.com,rboyle@foleyfreeman.com

/s/ _____
Noah G. Hillen

**APPELLEE'S EXCERPTS FROM RECORD - 3**

# Tab 1

Noah G. Hillen, ISB No. 7690
CHAPTER 7 BANKRUPTCY TRUSTEE
P.O. Box 6538
Boise, Idaho 83707
Telephone (208) 297-5774
Facsimile (208) 297-5224
ngh@hillenlaw.com

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>Porrett, Gary & Jennifer,<br><br>                 Debtors. | Case No. 09-03881-JDP<br>Chapter 7<br><br>**MOTION TO APPROVE COMPROMISE UNDER FED. R. BANKR. P. 9019** |

---

**NOTICE OF MOTION TO APPROVE COMPROMISE UNDER FED. R. BANKR. P. 9019 AND OPPORTUNITY TO OBJECT AND FOR A HEARING**

**No Objection.** The Court may consider this request for an order without further notice or hearing unless a party in interest files an objection within **21** days of the date of service of this notice.

If an objection is not filed within the time permitted, the Court may consider that there is no opposition to the granting of the requested relief and may grant the relief without further notice or hearing.

**Objection.** Any objection shall set out the legal and/or factual basis for the objection. A copy of the objection shall be served on the movant.

**Hearing on Objection.** The objecting party shall also contact the court's calendar clerk to schedule a hearing on the objection and file a separate notice of hearing.

---

COMES NOW Noah Hillen (the "Trustee"), the duly appointed chapter 7 bankruptcy trustee for the bankruptcy estate of Gary & Jennifer Porrett (the "Debtors"), pursuant to Federal Rule of Bankruptcy Procedure 9019, and moves the Court for approval of a compromise (the "Motion") regarding a pre-petition claim against Wells Fargo related to a June 25, 2007 home loan

(the "Claim").  Through the compromise, the estate to receive a gross settlement of $8,120.63, with expected net proceeds to the estate of $8,120.63.

## I.  FACTS

**The Claim**

  1.  The Debtor's obtained a home loan from Wells Fargo on June 25, 2007.

  2.  Wells Fargo improperly funneled the Debtor's home loan into a sub-prime loan, which included a higher interest than the Debtor qualified for.

  3.  This resulted in the Debtor's paying more in interest over the life of the loan to Wells Fargo than they otherwise should have (the difference between the non-prime and prime loan interest rates).

  4.  On December 9, 2009 the Debtors filed for relief under chapter 7 of the Bankruptcy Code.   Jeremy Gugino was appointed as the chapter 7 trustee.  Gugino previously distributed $2,546.65.

  5.  On July 2, 2010, Wells Fargo obtained stay relief in order to pursue its state law remedies as to the Debtors' home.

  6.  On February 17, 2011, the case closed.

  7.  On July 20, 2011, Wells Fargo reached an agreement with the Federal Reserve Board regarding borrowers who received more expensive nonprime loans, which may have had higher interest rates than traditional prime rate loans, between January 1, 2006 and September 30, 2008.

  8.  On April 28, 2015, the case was reopened to administer the Claim, and Trustee was appointed shortly thereafter.

  9.  Subject to Court approval, the estate will receive $8,120.63 to settle the claim.

  10.  $10,146.76 in timely claims have been filed in this case, and $1,894.81 was previously paid to creditors, leaving $8,251.95 in unpaid claims.

## II.  PROPOSED COMPROMISE

The bankruptcy estate will receive a gross settlement of $8,120.63 to settle the Claim.  By accepting the compensation, the bankruptcy estate and the Debtors shall release Wells Fargo Financial, Inc. and Wells Fargo & Company (and their subsidiaries, successors and assigns) from

any and all claims related to Wells Fargo's origination of a more expensive mortgage loan that
the loan for which the Debtors potentially qualified.  By this motion, the Trustee is requesting the
authority to execute the Acceptance of Compensation and Release, attached hereto as **Exhibit A**,
on behalf of the estate and the Debtors.

Subject to Court approval, the Trustee asserts that the settlement is a "fair and equitable"
resolution of the dispute based upon factors such as:  the probability of successfully litigating the
Claim; difficulty in enforcement of a judgment; the complexity, expense, and delay of the
litigation; the risk of non-collection; and the paramount interest of creditors as analyzed below.
*In re Marples*, 266 B.R. 202, 206, 01.3 I.B.C.R. 116, 118 (Bankr. D. Idaho 2001); *Martin v.
Kane (In re A & C Properties)*, 784 F. 2d 1377, 1381-83 (9th Cir. 1986).

**A.  The A & C Factors Applied to the Compromise of the Claim**.

**1.  Probability of Successfully Litigating the Claim**

This factor weighs in favor of compromise.  "Rather than an exhaustive investigation or a
mini-trial on the merits, the bankruptcy court need only find that the settlement was negotiated in
good faith and is reasonable, fair and equitable."  *Spirtos v. Ray (In re Spirtos)*, 2006 Bankr.
LEXIS 4894 at 32 (9th Cir. BAP 2006).

In order to prosecute the Claim, the estate would require the cooperation of the Debtors to
testify in regard to the mortgage loan they obtained, and the harm they suffered as a result of
paying a higher interest rate.  Trustee has been unable to contact the Debtors.  All mail sent to
the Debtors' last known address is returned as undeliverable.  Without the cooperation of the
Debtors, prosecution of the claim will be extremely difficult.

**2.  Difficulty in Enforcement of a Judgment**

While the Trustee does not believe the Defendant would disobey this Court's order, if it
did, Trustee would have to incur the cost and delay of enforcing such a judgment.

**3.  The Complexity, Expense, and Delay of the Litigation**

This factor weighs in favor of compromise.  The inconvenience and expense of the
litigation favor compromise because it will enable fair and efficient administration of the estate's
interest in the Claim without the expense and delay associated with litigation.  Further, the estate
would likely need expert testimony to quantify the harm to the Debtors' credit as a result of a

default on the home loan.  This litigation could be complex and expensive due to the needed expert testimony.  Should the Trustee be required to prosecute the claim, distribution to creditors could be delayed by years, and there is a risk that creditors would receive no additional distribution should the estate fail to prove the Claim at trial.

### 4.  The Paramount Interest of Creditors

Through this compromise, the estate will receive $8,120.63.  This is also the last asset the estate is administrating in this case, meaning that the estate will be able to distribute funds to creditors soon after receiving approval of this compromise.  The Trustee estimates that creditors will be paid approximately 80%-85% pro rata, when considering the prior 18% pro rata distribution paid to creditors.  Accordingly, a quick resolution of this matter is beneficial to the creditors.

## III.  CONCLUSION

Based upon the forgoing, the Trustee respectfully requests the Court enter an order granting the instant Motion.

Date: July 31, 2015

/s/
Noah G. Hillen

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of April, 2015, I filed the foregoing **MOTION TO APPROVE COMPROMISE UNDER FED. R. BANKR. P. 9019** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Patrick John Geile      pgeile@foleyfreeman.com, rboyle@foleyfreeman.com

David Wayne Newman      ustp.region18.bs.ecf@usdoj.gov

US Trustee      ustp.region18.bs.ecf@usdoj.gov

Jeffrey M Wilson      jeff@wilsonmccoll.com, louis@wilsonmccoll.com

AND, I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants by first class mail, postage prepaid:

Attached Matrix

/s/ Noah G. Hillen
Noah G. Hillen

Wells Fargo Financial Consent Order
Claims Administrator
PO Box 6515
Portland, OR 97228-6515



 633604323061

*000 0000029 00000000 003 004 00004 ᒪᒪᒪ: 0 0
NOAH HILLEN
PO BOX 6538
BOISE, ID 83707

# Acceptance of Compensation and Release

Submission Number: 113409

July 10, 2015

**Postmark response deadline**
**August 09, 2015**

**Subject:** Wells Fargo Financial loan number:  57544445
Date of loan: June 25, 2007
Income basis for loan (tax year): 2007
Borrower(s): GARY PORRETT, JENNIFER PORRETT

## I. Compensation and Payment

| | |
|---|---|
| **Base compensation** | |
| Nonprime vs. prime loan pricing | $6,120.63 |
| | |
| **Additional Compensation** | |
| Credit harm | $2,000.00 |
| | **Total: $8,120.63** |
| | |
| **Payment** | |
| To be paid by check | $8,120.63 |
| | **Total: $8,120.63** |

As indicated above, $8,120.63 will be paid by check made payable to all borrowers listed on the account. If you wish the disbursement to be made in another manner, please provide instructions here. Checks will be mailed within 10 business days of receipt of this signed form.

☐  I request $8,120.63 to be paid by check made payable to: _____
_____

Additional instructions:_____



## II. Release of liability

I understand that by accepting the compensation I have been offered, I am releasing Wells Fargo Financial, Inc. and Wells Fargo & Company (and their subsidiaries, successors and assigns) from any and all claims relating to Wells Fargo Financial's origination of a more expensive mortgage loan than the loan for which I potentially qualified.

| Borrower 1: GARY PORRETT | |
| --- | --- |
| **Signature** | **Date** |
| Signed by: ☐ Borrower   ☐ Borrower's representative | |

| Borrower 2: JENNIFER PORRETT | |
| --- | --- |
| **Signature** | **Date** |
| Signed by: ☐ Borrower   ☐ Borrower's representative | |

Label Matrix for local noticing
0976-1
Case 09-03881-JDP
District of Idaho [LIVE]
Boise
Fri Jul 31 11:12:54 MDT 2015

(p)ADA COUNTY ADA COUNTY TREASURER
200 W FRONT STREET
1ST FLOOR
BOISE ID 83702-7300

Beneficial
P.O. Box 3425
Buffalo, NY 14240-3425

Boise Pathology
P.O. Box 9589
Boise, ID 83707-4589

Boise Radiology
P.O. Box 44630
Boise, ID 83711-0630

Capital One
P.O. Box 30281
Salt Lake City, UT 84130-0281

Chase Student Loans
P.O. Box 522
Madison, MS 39130-0522

Citi
P.O. Box 91778
Albuquerque, NM 87199-1778

Citi Cards
P.O. Box 6241
Sioux Falls, SD 57117-6241

City of Kuna
P.O. Box 13
Kuna, ID 83634-0013

(p)DELL FINANCIAL SERVICES
P O BOX 81577
AUSTIN TX 78708-1577

Discover Bank
Dfs Services LLC
PO Box 3025
New Albany, OH 43054-3025

(p)DISCOVER FINANCIAL SERVICES LLC
PO BOX 3025
NEW ALBANY OH 43054-3025

Disney Movie Club
P.O. Box 758
Neenah, WI 54957-0758

Fia Card Services, NA/Bank of America
by American Infosource Lp As Its Agent
PO Box 248809
Oklahoma City, OK 73124-8809

GE Capital
P.O. Box 981400
El Paso, TX 79998-1400

GE Money Bank
P.O. Box 96016
Orlando, FL 32896-0016

GE Money Bank
c/o Recovery Management Systems Corporat
25 SE 2nd Ave Suite 1120
Miami FL 33131-1605

Patrick John Geile
FOLEY FREEMAN, PLLC
PO Box 10
Meridian, ID 83680-0010

Ginny's
1112 7th Avenue
Lone Rock, WI 53556-1364

HSBC Bank
P.O. Box 81622
Salinas, CA 93912-1622

Noah G. Hillen
P.O. Box 6538
Boise, ID 83707-6538

Monroe Main
1112 7th Avenue
Lone Rock, WI 53556-1364

David Wayne Newman
OFFICE OF THE US TRUSTEE US DEPT
720 Park Blvd., Ste. 220
Boise, ID 83712-7785

Old Navy
P.O. Box 981400
El Paso, TX 79998-1400

PCS Stamps & Coins
47 Richards Avenue
Norwalk, CT 06857-0001

Gary Alan Porrett
1400 N. Meadowvalley Way
Star, ID 83669-5071

Jennifer Sue Porrett
1400 N. Meadowvalley Way
Star, ID 83669-5071

Que
P.O. Box 990003
Boise, ID 83799-0003

St. Luke's
P.O. Box 2578
Boise, ID 83701-2578

Stratford
P.O. Box 1560
Saint Albans, VT 05478-5560

TPD Property Management
7191 E. Hampton
Nampa, ID 83687-9469

US Trustee
Washington Group Central Plaza
720 Park Blvd, Ste 220
Boise, ID 83712-7785

Wachovia
P.O. Box 1697
Winterville, NC 28590-1697

Walmart
P.O. Box 98140
El Paso, TX 79998

Wells Fargo Bank
P.O. Box 5445
Portland, OR 97228

Wells Fargo Financial
c/o Jeffrey M. Wilson
PO Box 1544
Boise, ID 83701-1544

Wells Fargo Financial
604 Locust St.
Des Moines, IA 50309-3716

Wells Fargo Financial
P.O. Box 98798
Las Vegas, NV 89193-8798

Wells Fargo Financial Cards
3201 N. 4th Ave.
Sioux Falls, SD 57104-0700

Jeffrey M Wilson
POB 1544
Boise, ID 83701-1544

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Ada County Paramedics
P.O. Box 140209
Garden City, ID 83714-0209

Dell Financial Services
One Dell Way
PS2DF-17
Round Rock, TX  78682

Discover Card
P.O. Box 30954
Salt Lake City, UT 84130-0954

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Bank of America
P.O. Box 17054
DE 19830

(d)Noah G. Hillen
P.O. Box 6538
Boise, ID 83707-6538

End of Label Matrix
Mailable recipients    40
Bypassed recipients     2
Total                  42

# Tab 2

Case 1:16-cv-00135-MWB    Document 12    Filed 07/12/16    Page 15 of 83

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

In Re:

Porrett, Gary A. & Jennifer S.,

                      Debtors.

Case No. 09-03881-JDP
Chapter 7

**Order Granting Motion to Approve Compromise Under Fed. R. Bankr. P. 9019**

This matter came before the Court on the Motion to Approve Compromise Under Fed. R. Bankr. P. 9019 (CR 50) (the "Motion") filed on July 31, 2015.  Gary and Jennifer Porrett (the "Debtors") filed their Objection to Motion to Approve Compromise (CR 53) on September 2, 2015, which was resolved at the September 15, 2015 hearing regarding the Motion.

The Court having reviewed the Motion, and good cause appearing therefor, IT IS HEREBY ORDERED that:

1.      The Motion is granted and Noah Hillen (the "Trustee") the chapter 7 trustee is authorized to sign the Acceptance of Compensation and Release Agreement (the "Agreement") attached to the Motion as Exhibit A, in lieu of the Debtors signatures, and such signing will bind the Debtors and the bankruptcy estate to the terms of the Agreement.

2.      The Debtors and the Trustee earch reserve their rights as to the question whether the settlement proceeds are property of the bankruptcy estate, and Trustee shall hold these funds in the estate bank account until resolution of such matter.  //end of text//

Dated:  September 18, 2015

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

Order submitted by Noah Hillen, Chapter 7 Bankruptcy Trustee.

APPROVED AS TO FORM AND CONTENT:

FOLEY FREEMAN, PLLC

/s/ (email approval dated 9/16/15)
Patrick J. Geile
Attorneys for Debtors

Case 6:16-cv-00135-MWB   Document 12   Filed 07/12/16   Page 17 of 83
Case 09-03881-JDP   Doc 36-3   Filed 09/18/15   Entered 09/18/15 07:15:18   Desc
Order on Compromise of Controv: Notice Recipients   Page 1 of 1

# Notice Recipients

District/Off: 0976–1                  User: twilliams                  Date Created: 9/18/2015
Case: 09–03881–JDP                  Form ID: pdf047                  Total: 4

**Recipients of Notice of Electronic Filing:**
ust     US Trustee          ustp.region18.bs.ecf@usdoj.gov
aty     David Wayne Newman          ustp.region18.bs.ecf@usdoj.gov

                                                                    TOTAL: 2

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db      Gary Alan Porrett          1400 N. Meadowvalley Way          Star, ID 83669
jdb     Jennifer Sue Porrett          1400 N. Meadowvalley Way          Star, ID 83669

                                                                    TOTAL: 2

Appellee Record - 14

# Tab 3

Patrick J. Geile,
Bar No. 6975
FOLEY FREEMAN, PLLC
953 S. Industry Way
P.O. Box 10
Meridian, ID 83680
Phone: (208) 888-9111
FAX: (208) 888-5130
pgeile@foleyfreeman.com

Attorney for Debtors

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No. 09-03881-JDP |
| **GARY ALAN PORRETT and JENNIFER SUE PORRETT,** | Chapter 7 |
| Debtors. | |

### JOINT MOTION FOR DETERMINATION OF PROPERTY OF THE BANKRUPTCY ESTATE

COMES NOW the Debtors, by and through their counsel of record, Patrick J. Geile of Foley Freeman, PLLC, and the chapter 7 trustee, Noah Hillen, and hereby make a joint motion for determination of property of the estate. There is currently a dispute regarding whether approximately $8,120.23 held by the Trustee is or is not property of the estate. This motion is based on the stipulated joint statement of undisputed facts and exhibits filed concurrently herewith.

1. The parties agree that the determination of property of thee estate is a matter that can be resolved by motion, rather than adversary proceeding, to expedite the matter in this case, and the parties waive their rights to an adversary proceeding.

2.    The Debtors have individually signed the stipulated Joint Statement of
Undisputed Facts and admissible exhibits.

DATED this 20th day of January, 2016.

FOLEY FREEMAN, PLLC

/s/

Patrick J. Geile

DATED this 20th day of January, 2016.

/s/

Noah Hillen, Chapter 7 Trustee

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of January, 2016, I caused to be served a true and correct copy of the foregoing document by the method indicated below, and addressed to the following:

| | | |
|---|---|---|
| Office of the U.S. Trustee<br>Washington Group Central Plaza<br>720 Park Blvd., Ste. 220<br>Boise, ID 83712 | __X__ | CM/ECF Notice |
| Noah G. Hillen<br>PO Box 6538<br>Boise, ID 83707 | __X__ | CM/ECF Notice |
| Wells Fargo Financial<br>c/o Jeffrey M. Wilson<br>PO Box 1544<br>Boise, ID 83701 | __X__ | CM/ECF Notice |
| All parties on Attachment A | __X__ | US Mail |

/s/_____
Patrick J. Geile

## ATTACHMENT A

Ada County Paramedics
P.O. Box 140209
Garden City, ID 83714-0209

Bank of America
P.O. Box 17054
DE 19830

Beneficial
P.O. Box 3425
Buffalo, NY 14240

Boise Pathology
P.O. Box 9589
Boise, ID 83707

Boise Radiology
P.O. Box 44630
Boise, ID 83711-0630

Capital One
P.O. Box 30281
Salt Lake City, UT 84130

Chase Student Loans
P.O. Box 522
Madison, MS 39130

Citi
P.O. Box 91778
Albuquerque, NM 87119

Citi Cards
P.O. Box 6241
Sioux Falls, SD 57117

City of Kuna
P.O. Box 13
Kuna, ID 83634

Dell Financial Services
One Dell Way
PS2DF-17
Round Rock, TX 78682

Discover Bank
Dfs Services LLC
PO Box 3025
New Albany, OH 43054-3025

Discover Card
P.O. Box 30954
Salt Lake City, UT 84130-0954

Disney Movie Club
P.O. Box 758
Neenah, WI 54957-0758

Fia Card Services
NA/Bank of America
by American Infosource Lp
PO Box 248809
Oklahoma City, OK 73124-8809

GE Capital
P.O. Box 981400
El Paso, TX 79998

GE Money Bank
P.O. Box 96016
Orlando, FL 32896-0016

GE Money Bank
c/o Recovery Management
Systems Corporate
25 SE 2nd Ave Suite 1120
Miami FL 33131-1605

Ginny's
1112 7th Avenue
Lone Rock, WI 53556-1364

HSBC Bank
P.O. Box 81622
Salinas, CA 93912

Monroe Main
1112 7th Avenue
Lone Rock, WI 53556-1364

Old Navy
P.O. Box 981400
El Paso, TX 79998

PCS Stamps & Coins
47 Richards Avenue
Norwalk, CT 06857

Que
P.O. Box 990003
Boise, ID 83799-0003

St. Luke's
P.O. Box 2578
Boise, ID 83701-2578

Stratford
P.O. Box 1560
Saint Albans, VT 05478-5560

TPD Property Management
7191 E. Hampton
Nampa, ID 83687

Wachovia
P.O. Box 1697
Winterville, NC 28590

Walmart
P.O. Box 98140
El Paso, TX 79998

Wells Fargo Bank
P.O. Box 5445
Portland, OR 97228

Wells Fargo Financial
604 Locust St.
Des Moines, IA 50309

Wells Fargo Financial
P.O. Box 98798
Las Vegas, NV 89193

Wells Fargo Financial Cards
3201 N. 4th Ave.
Sioux Falls, SD 57104

# Tab 4

Patrick J. Geile,
Bar No. 6975
**FOLEY FREEMAN, PLLC**
953 S. Industry Way
P.O. Box 10
Meridian, ID 83680
Phone: (208) 888-9111
FAX: (208) 888-5130
pgeile@foleyfreeman.com

**Attorney for Debtors**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **In re:** | **Case No. 09-03881-JDP** |
| **GARY ALAN PORRETT and JENNIFER SUE PORRETT,** | **Chapter 7** |
| **Debtors.** | **JOINT STATEMENT OF UNDISPUTED FACTS AND STIPULATION REGARDING ADMISSION OF EXHIBITS** |

COMES NOW the counsel for the debtors (the "Debtors"), Patrick J. Geile of Foley Freeman, PLLC, and the chapter 7 trustee, Noah Hillen (the "Trustee"), and hereby stipulate and agree as follows:

### I.     INTRODUCTION

The Debtors and Trustee dispute whether $8,120.63 in funds now held by the bankruptcy estate are property of the bankruptcy estate. In order to expedite resolution of this dispute, the Debtors and Trustee hereby agree to decide this issue through a motion and forgo the adversary process. *See* Fed. R. Bank. P. 7001(2). This stipulation establishes (1) stipulated facts; (2) admissible exhibits; and (3) a briefing

schedule.

## II.    STIPULATED FACTS

1.     The Debtor's obtained a home loan from Wells Fargo on June 25, 2007.

2.     Wells Fargo improperly funneled certain borrower's home loans into a sub-prime loan, which included a higher interest than the Borrower qualified for.

3.     This resulted in certain classes of borrowers paying more in interest over the life of the loan to Wells Fargo than they otherwise should have (the difference between the non-prime and prime loan interest rates).

4.     The Debtors are included in the class of borrowers addressed in an agreement between Wells Fargo and the Board of Governors of the Federal Reserve System.

5.     On December 9, 2009 the Debtors filed for relief under chapter 7 of the Bankruptcy Code. Jeremy Gugino was appointed as the chapter 7 trustee. Gugino previously distributed $2,546.65.

6.     On July 2, 2010, Wells Fargo obtained stay relief in order to pursue its state law remedies as to the Debtors' home.

7.     On February 17, 2011, the case closed.

8.     On July 20, 2011, Wells Fargo reached an agreement with the Federal Reserve Board regarding borrowers who received more expensive nonprime loans, which may have had higher interest rates than traditional prime rate loans, between January 1, 2006 and September 30, 2008.

9.     On April 28, 2015, the case was reopened and Trustee was appointed shortly thereafter.

10.     On July 31, 2015, the Trustee filed a Motion to Approve Compromise Under Fed. R. Bankr. P. 9019 (the "Compromise"), seeking to obtain a $8,120.63 gross settlement.

11.     On September 18, 2015, the Court approved the compromise with Wells Fargo, and the estate is in possession of $8,120.63.

### III.     EXHIBITS

12.     Attached hereto as **Exhibit A** is a copy of the consent order between Wells Fargo and the Board of Governors of the Federal Reserve System**.**

13.     The Debtors and Trustee stipulate and agree to the admission of Exhibit A as evidence in resolving this matter.

14.     Attached hereto as **Exhibit B** is a true and correct copy of the notice Wells Fargo has provided to effected borrowers.

15.     The Debtors and Trustee stipulate and agree to the admission of Exhibit B as evidence in resolving this matter.

### IV. BRIEFING SCHEDULE

16.     Hearing on this matter shall be set for February 23rd, 2016 at 9:30 a.m.

17.     The Parties agree to simultaneous briefing, with the initial brief due on February 3rd and any responsive brief filed by February 17th 2016.

DATED this 20th day of January, 2016.

FOLEY FREEMAN, PLLC

/s/_____
Patrick J. Geile

DATED this 20th day of January, 2016.

/s/_____
Noah Hillen, Chapter 7 Trustee

DATED this _____ day of November, 2015.

/s/_____
Gary Porrett

DATED this 28th day of December, 2015.

/s/_____
Jennifer Peterman
f/k/a Jennifer Porrett

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 20th day of January, 2016, I caused to be served a true and correct copy of the foregoing document by the method indicated below, and addressed to the following:

| | | |
|---|---|---|
| Office of the U.S. Trustee<br>Washington Group Central Plaza<br>720 Park Blvd., Ste. 220<br>Boise, ID 83712 | X | CM/ECF Notice |
| Noah G. Hillen<br>PO Box 6538<br>Boise, ID 83707 | X | CM/ECF Notice |
| Wells Fargo Financial<br>c/o Jeffrey M. Wilson<br>PO Box 1544<br>Boise, ID 83701 | X | CM/ECF Notice |
| All parties on Attachment A | X | US Mail |

                                  /s/ _____
                                  Patrick J. Geile

# ATTACHMENT A

Ada County Paramedics
P.O. Box 140209
Garden City, ID 83714-0209

Bank of America
P.O. Box 17054
DE 19830

Beneficial
P.O. Box 3425
Buffalo, NY 14240

Boise Pathology
P.O. Box 9589
Boise, ID 83707

Boise Radiology
P.O. Box 44630
Boise, ID 83711-0630

Capital One
P.O. Box 30281
Salt Lake City, UT 84130

Chase Student Loans
P.O. Box 522
Madison, MS 39130

Citi
P.O. Box 91778
Albuquerque, NM 87119

Citi Cards
P.O. Box 6241
Sioux Falls, SD 57117

City of Kuna
P.O. Box 13
Kuna, ID 83634

Dell Financial Services
One Dell Way
PS2DF-17
Round Rock, TX 78682

Discover Bank
Dfs Services LLC
PO Box 3025
New Albany, OH 43054-3025

Discover Card
P.O. Box 30954
Salt Lake City, UT 84130-0954

Disney Movie Club
P.O. Box 758
Neenah, WI 54957-0758

Fia Card Services
NA/Bank of America
by American Infosource Lp
PO Box 248809
Oklahoma City, OK 73124-8809

GE Capital
P.O. Box 981400
El Paso, TX 79998

GE Money Bank
P.O. Box 96016
Orlando, FL 32896-0016

GE Money Bank
c/o Recovery Management
Systems Corporate
25 SE 2nd Ave Suite 1120
Miami FL 33131-1605

Ginny's
1112 7th Avenue
Lone Rock, WI 53556-1364

HSBC Bank
P.O. Box 81622
Salinas, CA 93912

Monroe Main
1112 7th Avenue
Lone Rock, WI 53556-1364

Old Navy
P.O. Box 981400
El Paso, TX 79998

PCS Stamps & Coins
47 Richards Avenue
Norwalk, CT 06857

Que
P.O. Box 990003
Boise, ID 83799-0003

St. Luke's
P.O. Box 2578
Boise, ID 83701-2578

Stratford
P.O. Box 1560
Saint Albans, VT 05478-5560

TPD Property Management
7191 E. Hampton
Nampa, ID 83687

Wachovia
P.O. Box 1697
Winterville, NC 28590

Walmart
P.O. Box 98140
El Paso, TX 79998

Wells Fargo Bank
P.O. Box 5445
Portland, OR 97228

Wells Fargo Financial
604 Locust St.
Des Moines, IA 50309

Wells Fargo Financial
P.O. Box 98798
Las Vegas, NV 89193

Wells Fargo Financial Cards
3201 N. 4th Ave.
Sioux Falls, SD 57104

UNITED STATES OF AMERICA
BEFORE
THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

|  |  |  |
|---|---|---|
| In the Matter of: | ) | Docket Nos. 11-094-B-HC1 |
|  | ) | 11-094-I-HC1 |
| **WELLS FARGO & COMPANY,** | ) | 11-094-B-HC2 |
| San Francisco, California | ) | 11-094-I-HC2 |
|  | ) |  |
| and | ) | Order to Cease and Desist |
|  | ) | and Order of Assessment |
| **WELLS FARGO FINANCIAL, INC.,** | ) | of a Civil Money Penalty |
| Des Moines, Iowa | ) | Issued Upon Consent |
|  | ) |  |
|  | ) |  |

WHEREAS, in recognition of the common goals of the Board of Governors of the

Federal Reserve System (the "Board of Governors"), Wells Fargo & Company, San Francisco,

California ("Wells Fargo"), and its subsidiary, Wells Fargo Financial, Inc., Des Moines, Iowa

("Financial"), each a bank holding company as defined in the Bank Holding Company Act, 12

U.S.C. § 1841 *et seq.* ("BHC Act"), to ensure compliance by the consolidated Wells Fargo

organization with applicable federal and state laws, rules and regulations related to home

mortgage lending, and effective management of the legal, reputational, and compliance risks of

the consolidated Wells Fargo organization associated with home mortgage lending, the Board of

Governors, Wells Fargo, and Financial have mutually agreed to enter into this combined Order to

Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent (the

"Order");

WHEREAS, prior to September 2008, Financial conducted home mortgage lending

through nonbank subsidiaries located throughout the United States;



**EXHIBIT A**

Appellee Record - 27

WHEREAS, the Board conducted a targeted investigation of aspects of Financial's consumer lending operations during the period January 1, 2004 to September 2008, primarily involving home mortgage lending in stores located in certain areas of Florida, New York, Pennsylvania, Tennessee, Texas and New Mexico;

WHEREAS, Wells Fargo transferred Financial's lending operations to Wells Fargo's lead banking subsidiary, Wells Fargo Bank, N.A., Sioux Falls, South Dakota (the "Bank"), over a several month period ending in September 2008 (the "Reorganization");

WHEREAS, between the Reorganization and July 7, 2010, Financial's lending operations were conducted by loan production offices ("LPOs") of the Bank, with the Bank funding the home mortgage loans originated by the LPOs;

WHEREAS, on July 7, 2010, Wells Fargo announced that the Bank was closing nationwide the LPOs formerly operated as Financial stores;

WHEREAS, insofar as the home mortgage loans that Financial originated and funded between January 1, 2004, and the Reorganization remain outstanding, such loans remain assets of Financial (or otherwise remain subject to Financial's control) (the "Legacy Assets"), with the Bank servicing the Legacy Assets since the Reorganization;

WHEREAS, although Financial ceased originating and funding home mortgage loans in connection with the Reorganization, Financial or other entities of Wells Fargo may in the future engage in home mortgage lending operations;

WHEREAS, this Order is issued with respect to the following allegations:

A.    During the period from at least January 2004 to the Reorganization (the "Relevant Period"), Financial's business model with respect to home mortgage lending was to sell debt consolidation, cash-out refinance loans at sub-prime rates ("nonprime loans") to customers

2

principally through a network of more than 800 offices located throughout the United States,

called "stores." The principal marketing method was salespersonnel making outbound,

unsolicited telephone calls to individuals who had some existing customer relationship with

Financial. Under Financial's underwriting process, the salespersonnel were responsible for

obtaining income-related documents (such as pay stubs and W-2 forms) and forwarding them to

Financial's centralized underwriting centers. Financial typically did not require that borrowers

fill out and sign loan applications that included the borrower's representation of his or her

income.

B.     Under Financial's sales performance standards and incentive compensation

programs, Financial salespersonnel, called "team members," were expected to sell (a) a

minimum dollar amount of loans to avoid performance improvement plans that could result in

loss of their positions with Financial, and (b) a minimum dollar amount of loans to receive

incentive compensation payments above their base salary.

C.     In some cases, contrary to Financial's written policies and procedures,

salespersonnel marketed these loans to customers by representing that the debt-consolidation

home mortgage refinancing loans would improve or repair a consumer's credit.

### *Income Document Alteration or Falsification*

D.     Financial's internal controls were not adequate to detect and prevent instances

when certain of its salespersonnel, in order to meet sales performance standards and receive

incentive compensation, altered or falsified income documents and inflated prospective

borrowers' incomes to qualify those borrowers for loans that they would not otherwise have been

qualified to receive.

3

Appellee Record - 29

E.      During the Relevant Period, particular instances of customer income document

alteration or falsification by individual Financial salespersonnel came to the attention of

Financial's compliance officers.  The compliance officers investigated the particular instances

brought to their attention and disciplinary action was taken against certain individual

salespersonnel if their involvement in income document alteration or falsification was admitted

or otherwise proven.  In mid-2008, Financial took steps to improve its internal controls that made

it more difficult for salespersonnel to alter or falsify income-related documents.

### *Steering Potential Prime Borrowers Into Nonprime Loans*

F.      In or around August 2005, in response to public and regulatory criticism,

Financial initiated a process, referred to as the "A-Paper Filter," to provide prime pricing to

customers for qualifying debt consolidation cash-out refinancing mortgage loans.  Initially, if a

transaction "passed" the filter and a further underwriting process, the customer would be offered

prime pricing from Financial.  Beginning in or around February 2006, the A-Paper Filter was

modified so that customers with potentially qualifying transactions instead would be referred to

Financial's affiliate, Wells Fargo Home Mortgage ("Home Mortgage"), which would determine

the customer's eligibility for prime pricing and, if eligible, originate the prime priced home

mortgage loan.  At approximately the same time, Financial revised its performance standards and

compensation programs so that it generally was less advantageous for salespersonnel to sell a

prime loan to the customer than a nonprime loan.

G.      As a result of the modifications and revisions, some customers during the

Relevant Period who may have qualified for a prime priced home mortgage loan at Financial or

through referral to Home Mortgage were sold loans by salespersonnel priced at nonprime rates,

primarily through "upselling" prospective borrowers so that the borrowers requested cash-back

4

loans that were sufficiently large that the borrowers' transactions no longer qualified for prime

pricing. While the customers received disclosures regarding the nonprime rates they were being

charged, the customers were not advised that they may have qualified for prime priced loans or

that it was generally more advantageous for the salesperson to sell a nonprime, rather than a

prime, loan.

     H.     Financial's internal controls, including controls relating to Financial's sales

performance standards and compensation programs, were not adequate to detect and prevent

incidents of evasion of the A-Paper Filter by Financial salespersonnel.

     I.     Deficiencies specified in paragraphs D. through H. above resulted in:

          a.     Unsafe or unsound banking practices;

          b.     Unfair or deceptive acts or practices within the meaning of section 5(a)(1)

               of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1);

          c.     Violations of various state laws pertaining to fraud and false or misleading

               statements in home mortgage loan-related documents, and to unfair or

               deceptive acts or practices.

     WHEREAS, the Board is assessing a civil money penalty of $85 million against Wells

Fargo and Financial pursuant to section 8(i)(2)(B) of the FDI Act, 12 U.S.C. § 1818(i)(2)(B);

     WHEREAS, Wells Fargo and Financial have agreed to make restitution to borrowers

with respect to the Legacy Assets (and with respect to home mortgage loans that would be

Legacy Assets except that they are no longer outstanding ("Former Legacy Assets")) in

accordance with the provisions of this Order pursuant to section 8(b)(6)(A) of the FDI Act, 12

U.S.C. § 1818(b)(6)(A). The amount of remedial compensation (in the form specified in

subparagraph 5.a. below) that each eligible borrower is expected to receive ranges between

Appellee Record - 31

$1,000 and $20,000, but some eligible borrowers may receive less than $1,000 and others may receive more than $20,000, depending on their particular circumstances. The number of eligible borrowers who may receive remedial compensation is estimated to be between about 3,700 to possibly more than 10,000; and

WHEREAS, on July 19, 2011, and July 18, 2011, respectively, the boards of directors of Wells Fargo and Financial, at duly constituted meetings, adopted resolutions:

A. Authorizing and directing James M. Strother, Executive Vice President and General Counsel, and Dean R. Anderson, President, to enter into this Order on behalf of Wells Fargo and Financial, respectively, and consenting to compliance by Wells Fargo and Financial and each of their institution-affiliated parties, as defined in Sections 3(u) and 8(b)(3) of the FDI Act, 12 U.S.C. §§ 1813(u) and 1818(b)(3), with each and every applicable provision of this Order;

B. Waiving the issuance of a notice of charges and a notice of assessment of a civil money penalty on any and all matters set forth in this Order;

C. Waiving a hearing for the purpose of taking evidence on any and all matters set forth in this Order;

D. Waiving any and all rights to contest the issuance of a cease and desist order or an assessment of a civil money penalty by the Board of Governors pursuant to 12 U.S.C. § 1818;

E. Waiving any and all rights to judicial review of this Order; and

F. Waiving any and all rights to challenge or contest the validity, effectiveness, terms or enforceability of the provisions of this Order.

NOW, THEREFORE, before the filing of any notices, or taking of any testimony or adjudication of or finding on any issues of fact or law herein, and without this Order constituting

Appellee Record - 32

an admission by Wells Fargo, Financial or any other Wells Fargo subsidiary of any allegation made or implied by the Board of Governors in connection with this matter, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony and pursuant to the aforesaid resolutions:

**IT IS HEREBY ORDERED**, pursuant to sections 8(b) and 8(i) of the FDI Act, 12 U.S.C. §§ 1818(b) and (i), that:

## I.  WELLS FARGO'S OVERSIGHT OF ANTI-FRAUD PROGRAMS AND CONSUMER COMPLIANCE WITH RESPECT TO MORTGAGE LENDING

1.  Within 90 days of the date of this Order, Wells Fargo shall submit an acceptable plan for overseeing fraud prevention and detection, and overseeing compliance with applicable federal and state laws pertaining to unfair or deceptive acts or practices and with section 129C of the Truth in Lending Act, 15 U.S.C. § 1639c ("applicable UDAP and Other Laws") with respect to mortgage lending by Wells Fargo and its subsidiaries. For purposes of this Order, "mortgage lending" shall mean lending that results in the origination of a "home mortgage loan" as defined in section 228.12 of the Board's Regulation BB, 12 C.F.R. § 228.12. The plan may be based on Wells Fargo oversight plans that currently exist or are under development, but, at a minimum, shall include:

a.  Policies and procedures with respect to Wells Fargo's oversight of its subsidiaries that engage in mortgage lending which are designed to ensure that such subsidiaries adequately investigate whether incidents involving employee fraud, including incidents of the type subject to the remedial actions required by paragraphs 3 through 7 of this Order, are isolated incidents or examples of more prevalent control breakdowns or violations of applicable UDAP and Other Laws. To the extent that such investigations are conducted by Wells Fargo, the policies and procedures should be designed to ensure adequate investigation by Wells Fargo;

7

b.     Policies and procedures with respect to Wells Fargo's oversight of its subsidiaries

that engage in mortgage lending which are designed to ensure (i) that there is an adequate

response to the results of investigations referred to in subparagraph a., above, including

escalation protocols that provide for the reporting to appropriate senior management, both within

and outside of the normal business line, including the senior compliance and risk management

officers, and, when appropriate, the board of directors, of incidents of employee fraud, and (ii)

that appropriate corrective action be taken by such subsidiaries with respect to any such

incidents, including incidents of the type subject to the remedial actions required by paragraphs 3

through 7 of this Order;

c.     A plan for the periodic review and, as appropriate, revision of the policies and

procedures specified by subparagraphs a. and b., above;

d.     Periodic risk assessments of Wells Fargo subsidiaries engaged in mortgage

lending with respect to vulnerabilities to employee fraud, and for compliance with applicable

UDAP and Other Laws, conducted by qualified personnel independent of the business lines; and

e.     An enhanced audit plan (which may include elements of Wells Fargo's existing

audit plan) for assessing the effectiveness of Wells Fargo's oversight of employee fraud

prevention, and compliance with applicable UDAP and Other laws, with respect to mortgage

lending by Wells Fargo and its subsidiaries, including periodic testing for compliance with the

policies and procedures specified by subparagraphs a. and b., above.

## II.     WELLS FARGO'S INCENTIVE COMPENSATION AND PERFORMANCE MANAGEMENT PROGRAMS FOR MORTGAGE LENDING

2.     Within 90 days of the date of this Order, Wells Fargo shall submit an acceptable plan for

overseeing the implementation and modification of incentive compensation and performance

management programs for sales, sales management, and underwriting personnel with respect to

8

mortgage lending within the Wells Fargo organization, consistent with Wells Fargo's overall management and oversight of compensation practices at Wells Fargo and its subsidiaries. (For purposes of this Order, "performance management programs" shall mean programs that subject employees to discipline or termination for failure to meet sales performance standards.) The plan may be based on Wells Fargo incentive compensation and performance management plans or programs that currently exist or are under development, but, at a minimum, shall include:

a. Provisions designed to ensure that incentive compensation and performance management practices with respect to mortgage lending encourage sales, sales management, and underwriting personnel to implement fully anti-fraud measures and mortgage lending principles (currently denominated "responsible lending principles") issued by Wells Fargo and the relevant subsidiary or unit within Wells Fargo;

b. Provisions designed to ensure that incentive compensation and performance management practices with respect to mortgage lending encourage sales, sales management, and underwriting personnel to avoid fraudulent or unfair or deceptive acts and practices and to adhere to all applicable UDAP and Other Laws;

c. Provisions designed to ensure that Wells Fargo and its subsidiaries and units adhere to the Interagency Guidance on Sound Incentive Compensation Practices, 75 Federal Register 36,395 (June 21, 2010), (as amended from time to time) with respect to mortgage lending practices;

d. Provisions designed to ensure that any practice of Wells Fargo or any of its subsidiaries or units engaged in mortgage lending of referring customers or applications from one business unit to another (whether within the same legal entity or from one legal entity to another) does not create undue incentives to evade Wells Fargo's denominated responsible

9

lending principles, applicable UDAP and Other Laws, or internal controls applicable to Wells

Fargo or the relevant subsidiary or unit of Wells Fargo;

     e.     Provisions designed to ensure that Wells Fargo or the relevant subsidiary or unit

of Wells Fargo has robust internal controls for compliance of incentive compensation and

performance management programs with respect to mortgage lending with Wells Fargo's anti-

fraud measures and denominated responsible lending principles, and with applicable UDAP and

Other Laws;

     f.     Periodic risk assessments conducted by qualified personnel independent of the

business lines (including personnel from risk management and control functions, with at least

supervisory participation by the Chief Risk Officer) of Wells Fargo's, and of each of its

subsidiary's and business unit's incentive compensation and performance management programs

pertaining to mortgage lending.  The risk assessments shall include risks arising from programs

that subject employees to discipline or termination for failure to meet sales performance

standards;

     g.     An enhanced audit plan (which may include elements of Wells Fargo's existing

audit plan) for assessing incentive compensation and performance management programs

pertaining to mortgage lending and their compliance with Wells Fargo's anti-fraud measures and

denominated responsible lending principles, and compliance with applicable UDAP and Other

Laws.

**III.**    **REMEDIAL PLANS**

3.    Within 90 days of this Order, Wells Fargo and Financial shall submit to the Federal

Reserve Bank of San Francisco (the "Reserve Bank") acceptable written plans ("Remedial Plan

A" and "Remedial Plan B") concerning remedial plans with respect to Legacy Assets and Former

Legacy Assets (collectively, the "Remedial Plans");

10

a      The Remedial Plans shall include the scope of review and methodologies that
Wells Fargo and Financial will use to comply with the relevant requirements below; a schedule
for timely completion of Remedial Plans; the designation and appointment by Wells Fargo of a
qualified senior officer or committee of Wells Fargo, acceptable to the Reserve Bank, for the
purpose of coordinating, supervising, monitoring and overseeing the implementation and
completion of the Remedial Plans; periodic reports to the Reserve Bank throughout the
implementation and completion of the Remedial Plans; and a written commitment that any
workpapers associated with the Remedial Plans will be made available to the Reserve Bank upon
request; and

b.      Under the Remedial Plans, within 90 days of the date remedial compensation
payments are first made as required by this Order and quarterly thereafter, Wells Fargo and
Financial shall provide the Reserve Bank with a Remedial Payment Summary Report, providing
the loan numbers and total amounts of remedial compensation payments paid to borrowers
pursuant to the Remedial Plans. Wells Fargo and Financial shall make public an aggregate
summary of the Remedial Payment Summary Reports setting forth, with respect to each
Remedial Plan, the total number of borrowers who received remedial compensation and the total
amount of remedial compensation made to borrowers.

### A.    *Remedial Plan A – Altered or Falsified Income Documents*

4.    All Financial home mortgage borrowers whose loans were originated during the period
from January 1, 2004 through the Reorganization and whose home mortgage loans are Legacy
Assets or Former Legacy Assets are eligible to file claims with respect to Remedial Plan A.
Eligibility for the program shall not be dependent on whether the mortgage loan is currently
performing, is past due or in foreclosure proceedings, or has been subject to foreclosure or a

Appellee Record - 37

short sale, or whether the loan terms or principal amount has been modified. Claimants under Remedial Plan A are also eligible to receive remedial compensation under Remedial Plan B if they qualify.

5.     Financial shall submit an acceptable Remedial Plan A that shall, at a minimum, address, consider and include:

    a.    the retention of an acceptable independent third-party consultant or accounting firm ("Plan A Independent Party") to oversee Remedial Plan A and make decisions or review decisions made by Financial concerning eligibility and amount and form of appropriate remedial compensation consistent with the acceptable plan. For purposes of Remedial Plan A, the initial decisionmaker is referred to as "Administrator A," and to the extent that Financial acts as Administrator A, Financial's decisions under Remedial Plan A shall be reviewed by the Plan A Independent Party. For purposes of this Order, "appropriate remedial compensation" shall mean cash payment or other forms of compensation approved by the Reserve Bank;

    b.    a methodology for identifying the Financial home mortgage loan borrowers whose loans were most likely to have been issued based on income documents that were altered or falsified by sales personnel, taking into account, at a minimum:

        i.    whether any salesperson at a store where any borrower's home mortgage loan application was taken, processed, or originated altered or falsified the income of any Financial borrower used to underwrite any home mortgage loan or other loan product offered by Financial;

        ii.    a procedure for acquiring and analyzing relevant information when a loan is in past due status, or considered for loss mitigation;

Appellee Record - 38

     iii.    information identifying additional potentially affected borrowers that is derived from the claim filing process under Remedial Plan A;

     c.    a targeted communications strategy for making public Remedial Plan A eligibility requirements. The communications strategy shall, at a minimum, address, consider and include:

     i.    the form and substance of communications concerning Remedial Plan A on Wells Fargo's website;

     ii.    specimen copies of notification letters, which shall be sent, at a minimum, to all borrowers identified pursuant to the methodology described in subparagraph 5.b. of this Order;

     iii.    specimen copies of claim forms and appropriate related documentation for borrowers to file, which forms may include authorization to obtain the borrowers' tax returns from the Internal Revenue Service, a requirement that the borrower represent that he or she did not submit and was not aware of the submission of altered or falsified income documentation to Financial in connection with the borrower's loan application, and an appropriate form of release not to be executed earlier than notification of the borrower of the amount of remedial compensation offered;

     iv.    specimen copies of other communications between Administrator A and consumers, such as requests for additional information or decisions granting, granting in part, or denying claims;

     v.    a strategy designed to ensure that borrowers who are not fluent in English receive language-appropriate communications with respect to Remedial Plan A;

     vi.    time deadlines for the dissemination of communications so that potentially eligible borrowers are notified of Remedial Plan A as soon as is practicable.

Appellee Record - 39

    d.    the criteria for providing remediation to borrowers who submit claims, which shall include the following:

    i.    an assessment, based on income documentation provided by the borrower (including tax returns that the borrower has authorized the Internal Revenue Service to provide to Financial or Administrator A), as to whether, at the time the loan was made, the borrower's income or the income required to be used for the borrower by Financial's credit policies was lower than the income Financial used in underwriting the borrower's loan;

    ii.    if (i) above occurred, Administrator A shall determine what loan amount (if any) would have been approved had accurate and appropriate income documents been submitted to underwriting, applying Financial's underwriting standards as applied at the time the loan was underwritten, or an acceptable formula based on such underwriting standards. Financial shall provide appropriate remedial compensation to the borrower, based on the following calculations:

    (A)    if, under Financial's underwriting criteria, the borrower would have been granted a home mortgage loan based on his or her accurate and appropriate income documents, but for a lesser principal amount, the compensation shall consist of the origination points (typically 3 or 4 percent of the principal of the loan), interest payments, and any lender fees or penalties charged on the loan, but applied only to the difference between the loan amount that was granted and the loan amount that would have been granted if the income documents had not been altered or falsified, with appropriate adjustments (as approved by the Reserve Bank as part of Remedial Plan A) for remediation previously received by the borrower from Financial specifically for income document alteration or falsification by Financial salespersonnel;

14

(B)    if, under Financial's underwriting criteria, the borrower would not have been granted a home mortgage loan based on his or her accurate and appropriate income documents, the compensation shall consist of the origination points (typically 3 or 4 percent of the principal of the loan), interest payments, and any lender fees or penalties, charged on the loan, but applied only to the difference between the loan amount that was granted and the amount of mortgage and non-mortgage debt that the borrower consolidated in the loan, with appropriate adjustments (as approved by the Reserve Bank as part of Remedial Plan A) for remediation previously received by the borrower from Financial specifically for income document alteration or falsification by Financial salespersonnel;

iii.    supplemental appropriate remedial compensation to borrowers, based on additional information submitted by the borrower (which may include the borrower's credit bureau report ("CBR") relied on by Financial in underwriting the loan, which Financial shall provide to the borrower at the borrower's request if still available in Financial's file, and the borrower's subsequent CBRs) that he or she suffered other financial damage as a result of the income document alteration or falsification as follows:

(A)    if, primarily as a result of the additional payment obligation on the loan resulting from the altered or falsified documents, on or before the date of this Order the borrower was unable to make payments on the loan and suffered a materially reduced credit standing, Administrator A shall provide an additional $2,000 in appropriate remedial compensation; or

(B)    if, primarily as a result of the additional payment obligation on the loan resulting from the altered or falsified documents, on or before the date of this Order, the borrower's home was foreclosed on or the borrower sold the home in a short sale, Administrator

15

A shall provide an additional amount up to $7,000 in appropriate remedial compensation to
reimburse the borrower for any expenses attributable to the foreclosure or short sale;

    e.    a claims process to determine whether individual claims under Remedial Plan A

should be paid, consistent with the criteria set forth in this Order, which claims process shall

include acceptable time limits on the processing of claims so that the majority of all claims are

determined within 60 days of initial receipt of the necessary information from the borrower or

other relevant sources. The claims process shall:

    i.    give priority treatment to borrowers whose mortgage loans are currently

past due or in the process of foreclosure; and

    ii.    not require a borrower to file an initial claim where Financial already has

determined that the borrower's income documents were altered or falsified by one or more

Financial salespersonnel (but Administrator A may require the borrower to supply documents

necessary to complete the borrower's file and to process the claim consistent with this

paragraph);

    f.    provisions for circumstances in which, prior to the date of this Order, the

borrower's loan (where the borrower's loan otherwise qualifies for remediation under this

paragraph) was delinquent, modified, in default, foreclosed upon, or paid-off, or the borrower

was in bankruptcy, and for any other special circumstances, which provisions may either

increase or decrease the amount of remedial compensation owed to the borrower and are

designed to ensure that the borrower receives any remedial compensation owed in a form that

will provide benefits to the borrower regardless of the borrower's payment status;

    g.    provisions to establish an impartial informal appeal process to enable a borrower

to challenge the determination by Administrator A denying a claim or to challenge the amount of

Appellee Record - 42

remedial compensation awarded with respect to a claim. The appeal process shall not permit Financial to contest a final determination by the Plan A Independent Party to pay some or all of a claim, but shall permit Financial to provide information regarding its position on a claim to the impartial decisionmaker, which shall also be provided to the claimant, in an appeal initiated by the borrower;

      h.     a plan for the audit of the implementation process of Remedial Plan A.

      i.     provisions requiring that Financial (and any other Wells Fargo entities) provide full cooperation in providing information to the Plan A Independent Party;

      j.     a provision requiring that Financial shall provide the remedial compensation to borrowers within fifteen business days (ten business days for cash payments) of receipt of the final determination that a claim under Remedial Plan A should be paid;

      k.     a monthly report by Administrator A submitted to the Reserve Bank concerning the determinations made under Remedial Plan A, including a report on claims filed and amounts remediated by store and by sales person. This report is in addition to the quarterly Remedial Payment Summary Report required under paragraph 3 b. above; and

      l.     a date by which the borrower communications and notification processes contemplated by paragraph 5.c., above, and the borrower claims determination processes contemplated by paragraph 5.d., e. and f., above, are to be completed.

      ***B.    Remedial Plan B – Certain Prime Borrowers***

6.     Remedial Plan B will be available to certain Financial borrowers who received home mortgage loans at nonprime prices during the period January 1, 2006 through the Reorganization, but whose mortgage loans may have qualified for prime prices and are Legacy Assets or Former Legacy Assets. Recipients of remedial compensation under Remedial Plan B are also eligible to file claims under Remedial Plan A if they qualify.

17

7.     Financial shall submit an acceptable Remedial Plan B that shall, at a minimum, address, consider and include:

a.     the retention of an acceptable independent third-party consultant or accounting firm ("Plan B Independent Party") to administer Remedial Plan B and either make decisions or review decisions made by Financial concerning eligibility for and the amount and form of appropriate remedial compensation consistent with the acceptable plan. For purposes of Remedial Plan B, the initial decisionmaker is referred to as "Administrator B," and to the extent that Financial acts as Administrator B, Financial's decisions under Remedial Plan B shall be reviewed by the Plan B Independent Party. Plan A Independent Party and Plan B Independent Party may be the same acceptable independent third-party consultant or accounting firm;

b.     a detailed methodology or methodologies for initial screening of Financial's home mortgage loan records to identify those nonprime borrowers who, at the time their applications were submitted, would have passed the "A-Paper Filter" and been eligible for consideration for prime pricing at Home Mortgage by virtue of any one or more of the following:

i.     without any unrestricted cash back, the loan would have been eligible for consideration for prime pricing at the time the borrower's mortgage was processed;

ii.     the loan is or was a second-lien, but the second lien loan amount, when added to any existing first-lien balance, would have been eligible for consideration for prime pricing at the time the mortgage was processed; or

iii.     the loan purportedly was secured by a rental or investment property, but (a) the property was an owner-occupied home at the time the mortgage was processed, and (b) the loan would have been eligible for consideration for prime pricing if the real estate collateral instead was an owner-occupied home;

18

Appellee Record - 44

    c.    a detailed methodology or methodologies for determining for each borrower who passes the initial screening set forth in subparagraph 7.b. of this Order whether the borrower would have qualified for a prime loan at Home Mortgage at the time the borrower's mortgage was processed;

    d.    a detailed methodology or methodologies for determining for each borrower who would have qualified for a prime loan at Home Mortgage based on an application of the methodology or methodologies specified in subparagraph 7.c. of this Order the amount of appropriate remedial compensation, if any, for which the borrower qualifies. Such methodology or methodologies shall provide for:

        i.    a calculation of an amount that is based on:

        (A)    the difference between the amount in origination points paid by the borrower (typically 3 or 4 percent of the principal of the loan) for the nonprime loan and the points typically paid by Home Mortgage prime borrowers at the time the relevant borrower's loan was originated (for example, assuming one point was charged on Home Mortgage's prime loans at the relevant time, on a $150,000 principal loan, the calculation would be $4,500, representing the difference in origination points between the four points typically charged on Financial nonprime loans and the single point charged on the Home Mortgage prime loan) ("excess points");

        (B)    the difference in interest payments previously paid by the borrower on the nonprime loan from the date of origination and interest payments based on the applicable rate at Home Mortgage for comparable prime loans at the time of origination;

        (C)    the difference in any lender fees or penalties paid by the borrower on the nonprime loan between the date of origination and Administrator B's determination and

any fees or penalties the borrower would have paid during the same period on the Home

Mortgage prime loan for which the borrower would otherwise have qualified; and

       (D)    if the borrower's Financial nonprime loan is a Legacy Asset,

prospective reduction of the borrower's interest rate to the applicable rate at Home Mortgage for

comparable prime loans at the time of origination;

       ii.    appropriate adjustments (as approved by the Reserve Bank as part of

Remedial Plan B) for remediation previously received by the borrower from Financial

specifically because the borrower's application was improperly prepared or processed so as not

to pass the "A-Paper Filter"; and

       iii.    supplemental appropriate remedial compensation to borrowers, based on

additional information submitted by the borrower (which may include the borrower's CBR relied

on by Financial in underwriting the loan, which Financial shall provide to the borrower at the

borrower's request if still available in Financial's file, and the borrower's subsequent CBRs) that

he or she suffered other financial damage as a result of not having been offered or otherwise

advised of the availability of a prime priced home mortgage loan as follows:

       (A)    if, primarily as a result of the additional payment obligation on the

nonprime loan, on or before the date of this Order the borrower was unable to make payments on

the loan and suffered a materially reduced credit standing, Administrator B shall provide an

additional $2,000 in appropriate remedial compensation; or

       (B)    if, primarily as a result of the additional payment obligation on the

nonprime loan, on or before the date of this Order, the borrower's home was foreclosed on or the

borrower sold the home in a short sale, Administrator B shall provide an additional amount up to

Appellee Record - 46

$7,000 in appropriate remedial compensation to reimburse the borrower for any expenses

attributable to the foreclosure or short sale; and

     e.    a communications strategy implementing the borrower remediation process set

forth in subparagraphs 7.b., c. and d. of this Order. The communications strategy shall, at a

minimum, address, consider and include:

     i.    specimen copies of letters notifying borrowers that they qualify for and

will receive remedial compensation, and specifying any information or documents that the

borrowers must provide in order to obtain such remedial compensation (including an appropriate

form of release not to be executed earlier than notification of the borrower of the amount of

remedial compensation offered), which letters shall be sent to all borrowers identified as

qualifying for some amount of remedial compensation pursuant to the methodology or

methodologies specified in subparagraph 7.d. of this Order;

     ii.    specimen copies of other communications between Administrator B and

borrowers, such as requests for additional information;

     iii.    a strategy designed to ensure that borrowers who are not fluent in English

receive language-appropriate communications with respect to Remedial Plan B;

     iv.    time deadlines for the dissemination of communications so that notices are

sent to the borrowers identified as qualifying for some amount of remedial compensation

pursuant to the methodology or methodologies specified in paragraph 7.d. above within 120 days

of approval of Remedial Plan B by the Reserve Bank;

     f.    provisions for circumstances in which, prior to the date of this Order, the

borrower's loan (where the borrower's loan otherwise qualifies for remedial compensation under

this paragraph) was delinquent, modified, in default, foreclosed on, or paid-off, or the borrower

21

was in bankruptcy, and for any other special circumstances, which provisions may either increase or decrease the amount of remedial compensation owed to the borrower and are designed to ensure that the borrower receives any remedial compensation owed in a form that will provide benefits to the borrower regardless of the borrower's payment status;

g.      a process to permit Financial home mortgage borrowers, who are not identified by Administrator B pursuant to the methodology specified in subparagraph 7.d. as qualifying to receive some amount of remedial compensation under Remedial Plan B, to request that the Plan B Independent Party individually review whether the borrower's loan was properly processed in accordance with the methodologies specified in subparagraphs 7.b., c. and d. and qualifies for some amount of remediation in accordance with such methodologies, which process shall include acceptable time limits for such reviews so that the majority of reviews are determined within 60 days of the borrower's request (with extensions if the borrower does not timely submit necessary information). The review process shall include the form and substance of communications on Wells Fargo's website regarding the availability of the review process (including a toll-free telephone number to call for information regarding the review process). The review process may require the borrower to provide additional documents and information to enable the Plan B Independent Party to determine whether the borrower's loan was properly processed in accordance with the methodologies specified in subparagraphs 7.b., c. and d. The review process shall give priority treatment to borrowers whose mortgage loans are currently past due or in the process of foreclosure;

h.      for borrowers who receive remedial compensation pursuant to subparagraph 7.d provisions to establish an impartial informal appeal process with respect to the amount and form of remedial compensation awarded. The appeal process shall not permit Financial to contest a

Appellee Record - 48

final determination by Plan B Independent Party to pay all or any part of a claim, but shall permit Financial to provide information regarding its position on a claim to the impartial decisionmaker, which shall also be provided to the claimant, in an appeal initiated by the borrower;

       i.     a plan for the audit of the implementation process of Remedial Plan B.

       j.     provisions requiring that Financial (and any other Wells Fargo entities) provide full cooperation in providing information to the Plan B Independent Party;

       k.     a provision requiring that Financial shall provide appropriate remedial compensation to borrowers within fifteen business days (ten business days for cash payments) of a determination that the borrower qualifies for a certain amount of remedial compensation pursuant to the methodology specified in subparagraph d. above;

       l.     a monthly report by Administrator B submitted to the Reserve Bank concerning the determinations made under Remedial Plan B. This report is in addition to the quarterly Remedial Payment Summary Report required under paragraph 3.b. above and the monthly report required for Remedial Plan A under paragraph 5.k. above; and

       m.     a date by which the borrower communications and notification processes contemplated by paragraph 7.e., above, and the borrower claim determination processes contemplated by paragraph 7.b., c., d., f. and g., above, are to be completed

## IV.    APPROVALS AND PROGRESS REPORTS

8.    The plans and remedial measures required by paragraphs 1 through 7 of this Order shall be submitted to the Reserve Bank for review and approval. Acceptable plans and remedial measures shall be submitted to the Reserve Bank within the time periods set forth in this Order. Wells Fargo shall adopt and implement the approved plans and remedial measures within 10 days of approval. Upon adoption, Wells Fargo shall promptly implement the approved plans and remedial measures, unless otherwise set forth in an approved schedule of implementation, and

Appellee Record - 49

thereafter fully comply. During the term of this Order, the approved plans and remedial

measures shall not be amended or rescinded without the prior written approval of the Reserve

Bank.

9.      Within 90 days following this Order, and every calendar quarter thereafter, Wells Fargo

shall submit a written progress report to the Reserve Bank. The progress report shall detail the

actions taken to comply with each provision of this Order and the results of those actions. This

report is in addition to the quarterly Remedial Payment Summary Report required under

paragraph 3.b. above and the monthly reports required for Remedial Plan A under paragraph 5.k.

above and Remedial Plan B under paragraph 7.l. above. The Reserve Bank, at its discretion,

may require additional progress reports if necessary. Such reports may be discontinued when the

Reserve Bank, in writing, releases Wells Fargo from making further reports.

**V.      ASSESSMENT OF CIVIL MONEY PENALTY**

10.     Wells Fargo and Financial are hereby assessed a civil money penalty ("CMP") in the sum

of $85 million to be paid to the Board of Governors at the time of the execution of this Order by

Fedwire transfer of immediately available funds to the Federal Reserve Bank of Richmond, ABA

No. 05 1000033, beneficiary, Board of Governors of the Federal Reserve System. The Board of

Governors or the Federal Reserve Bank of Richmond on its behalf shall remit the funds to the

United States Treasury, pursuant to section 8(i) of the FDI Act, 12 U.S.C. § 1813(i).

**VI.     NOTICES**

11.     All communications regarding this Order shall be sent to:

> (a) Richard M. Ashton, Esq.
>     Deputy General Counsel
>     Board of Governors of the Federal Reserve System
>     20th & C Sts. N.W.
>     Washington, D.C. 20551

24

(b) Patrick Loncar
Vice President
Banking Supervision & Regulation
Federal Reserve Bank of San Francisco
101 Market Street
San Francisco, California 94105

(c) Wells Fargo & Co.
Douglas R. Edwards, Esq.
Assistant General Counsel
301 S. College Street
Charlotte, NC 28202-6000

(d) Wells Fargo Financial, Inc.
Douglas R. Edwards, Esq.
Assistant General Counsel
301 S. College Street
Charlotte, NC 28202-6000

with a copy to

Stuart C. Stock, Esq.
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, D.C. 20004

## VII. MISCELLANEOUS

12.    The provisions of this Order shall be binding, where applicable, on Wells Fargo and

Financial and each of their institution-affiliated parties, in their capacities as such, and their

successors and assigns.

13.    Each provision of this Order shall remain in effect and enforceable until stayed, modified,

terminated or suspended in writing by the Board of Governors.

14.    Notwithstanding any provision of this Order, the Board of Governors may, at its sole

discretion, grant written extensions of time to Wells Fargo and Financial to comply with any

provision of this Order.  The Board of Governors delegates to the Reserve Bank its authority to

grant, in the Reserve Bank's sole discretion, written extensions of time to comply with the

provisions of this Order.

Appellee Record - 51

15.    The provisions of this Order shall not bar, estop or otherwise prevent the Board of

Governors, the Reserve Bank, or any federal or state agency from taking any further action

affecting Wells Fargo or Financial, or any of their current or former institution-affiliated parties,

as defined in Sections 3(u) and 8(b)(3) of the FDI Act, 12 U.S.C. §§ 1813(u) and 1818(b)(3).

By order of the Board of Governors of the Federal Reserve effective this 20th day of July

2011.

WELLS FARGO & COMPANY                    BOARD OF GOVERNORS OF THE
San Francisco, California                        FEDERAL RESERVE SYSTEM


By:___/s/ James Strother_____        By:___/s/ Jennifer J. Johnson_____

WELLS FARGO FINANCIAL, INC.
Des Moines, Iowa


By:___/s/ Dean R. Anderson_____

Appellee Record - 52



# Wells Fargo Financial Consent Order

- Home
- Remedial Plan A
- Remedial Plan B
- Important Documents
- Contact Us

**If you opened a mortgage loan with Wells Fargo Financial between January 1, 2004 and
September 30, 2008, you may be eligible for compensation.**

**To find out if you are eligible to file a claim for compensation, read the information below. If you have
questions, you may call 1-866-960-5981 and speak with an agent from 8:00 am to 8:00 pm Eastern Time
Monday through Friday, or 9:00 am to 5:00 pm Eastern Time on Saturday (excluding official holidays), or
send an email to questions@wffconsentorder.com.**

On July 20, 2011, Wells Fargo & Company and Wells Fargo Financial, Inc. (together called "Wells Fargo") reached an
agreement with the Federal Reserve Board related in part to certain mortgage loans made by Wells Fargo Financial
("WFF") between January 1, 2004 and September 30, 2008. This agreement with the Federal Reserve Board is called the
Consent Order.

WFF principally made nonprime debt consolidation and cash-out refinance loans at approximately 800 storefront locations
across the United States. On July 7, 2010, Wells Fargo announced that it was closing these stores.

**Compensation as part of this agreement is limited to Wells Fargo Financial mortgages opened between January 1,
2004 and September 30, 2008. WFF mortgage loans OPENED either before January 1, 2004 or after September 30,
2008, are NOT eligible for review under the Consent Order.**

**The agreement is NOT about loans made by Wells Fargo Home Mortgage or by Wells Fargo Bank, N.A.**

The Consent Order has two programs: **Remedial Plan A** and **Remedial Plan B**. More information regarding each Plan can
be found by clicking on the links on the left side of the page. Current and former WFF borrowers may be eligible for
compensation under one or both of the Remedial Plans. A borrower's eligibility for compensation under one remedial plan
will not preclude him or her from also being eligible for compensation under the other remedial plans. There are no fees or
charges for filing a claim under either plan.

As part of the Consent Order, Wells Fargo has undertaken a process to identify WFF mortgage loans that fall within the
parameters for compensation. Wells Fargo is sending information by mail to borrowers who have been identified as
potentially eligible for compensation. However, other borrowers who have not yet been identified may also be eligible for
compensation.

If you believe your WFF mortgage loan qualifies for compensation and you do not receive a mailing by August 30, 2013,
you should notify Wells Fargo by calling **1-866-960-5981** as soon as possible.

**Notice:** If you need assistance in another language, please call **1-866-960-5981** or you may, at your option, consult your
own interpreter.

**Aviso.** Si necesita ayuda en otro idioma, llame al **1-866-960-5981** o, si lo prefiere, puede consultar a su propio intérprete.

Assistance is available in over 200 languages. If you need assistance in another language, please call **1-866-960-5981** or
you may, at your option, consult your own interpreter.

* You need Adobe Reader™ to read PDF files. Download Adobe Reader for free.

© 2013-2014 Wells Wells Fargo & Co. All rights reserved.    Wells Fargo | Privacy, Security & Legal | Fraud Control



# Tab 5

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

In Re:

**Gary A. Porrett and**                         **Bankruptcy Case**
**Jennifer S. Porrett,**                          **No. 09-03881-JDP**

                    **Debtors.**

_____

## MEMORANDUM OF DECISION
_____

Appearances:

    Patrick Geile, FOLEY FREEMAN, PLLC, Meridian, Idaho, Attorney for Debtors.

    Noah Hillen, Boise, Idaho, Chapter 7 Trustee.

### *Introduction*

In this chapter 7[1] case, the Court addresses an issue about the scope

_____

    [1]   Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all references to "Rules" are to the Federal Rules of Bankruptcy Procedure, 1001-9037.

MEMORANDUM OF DECISION – 1

of property included in the bankruptcy estate.

Debtors Gary Alan Porrett and Jennifer Sue Porrett ("Debtors"),
together with trustee Noah Hillen ("Trustee"), filed a Joint Motion for
Determination of Property of the Bankruptcy Estate ("the Joint Motion").
Dkt. No. 59.   In the Joint Motion,[2] the parties asked the Court to settle their
disagreement over a knotty issue: whether an $8,120.23 payment from
Wells Fargo Bank, now held by Trustee, is property of the bankruptcy
estate to be distributed to creditors, or instead, should be released to
Debtors.  To support their positions, the parties submitted a stipulation of
facts, as well as briefs.  Dkt. Nos. 60, 63, 64, 65.   The Court conducted a
hearing on the Joint Motion on February 23, 2016 at which Debtors'
counsel and Trustee offered oral arguments.  Dkt. No. 66.   Having taken
the issues under advisement, and having duly considered the stipulated

---

[2]  While a request for a declaratory judgment concerning whether an item
or asset is property of the estate would normally require an adversary
proceeding, *see* Rule 7001(9), parties may waive their right to an adversary
proceeding.  *Cogliano v. Anderson (In re Cogliano)*, 355 B.R. 792, 806 (9th Cir. BAP
2006) ("When the question of whether property is part of th estate is in
controversy, Rule 7001(2) requires an adversary proceeding, *absent waiver or
harmless error*. . . . ") (emphasis added).

MEMORANDUM OF DECISION – 2

Case 1:16-cv-00135-MWB   Document 12   Filed 07/12/16   Page 60 of 83

facts, briefs, and arguments of counsel, as well as the applicable law, this

Memorandum constitutes the Court's findings, conclusions, and explains

the reasons for its disposition of the Joint Motion. *See* Rules 9014, 7052.

## *Facts*[3]

Debtors obtained a home mortgage loan from Wells Fargo on June

25, 2007. On December 9, 2009, Debtors filed the chapter 7 petition

commencing this case. On June 10, 2010, Wells Fargo filed a motion for

relief from the automatic stay to foreclose on Debtors' home, alleging that

Debtors were delinquent in making payments on the loan; that Debtors

had not provided Wells Fargo adequate protection of its interest in the

home; and further, that Debtors' intention was to surrender the home.

Dkt. No. 21. On July 2, 2010, without objection from Debtors or the former

chapter 7 trustee, the Court entered an order for stay relief allowing Wells

---

[3] In addition to the Joint Statement of Undisputed Facts and Stipulation
Regarding Admission of Exhibits, Dkt. No. 60, the Court has referenced its own
docket in this bankruptcy case.

MEMORANDUM OF DECISION – 3

Fargo to foreclose.   Dkt. No. 26.[4]

On February 17, 2011, Debtors' bankruptcy case was closed and the

trustee was discharged.  Dkt. No 41.

A few months later, on July 20, 2011, in proceedings pending before

the Board of Governors of the Federal Reserve, Wells Fargo agreed to the

entry of a consent order ("the Consent Order").  Exhibit A, Dkt. No. 60.   In

those proceedings, the federal regulators alleged that Wells Fargo had

engaged in prohibited, sharp lending practices in making loans to its

borrowers between  2006 and 2008.  In particular, it was alleged that Wells

Fargo had diverted otherwise qualified borrowers away from "prime"

loans, into more expensive "nonprime" loans, to their financial detriment.

Wells Fargo denied it had acted improperly, and through the terms of the

Consent Order, the dispute was settled.  Among other actions, the Consent

Order required Wells Fargo to identify those borrowers who may have

been injured as a result of taking out nonprime loans during the relevant

---

[4]  It is unclear in the record whether Wells Fargo actually foreclosed on the
home.

MEMORANDUM OF DECISION – 4

time window, and to offer them what the Consent Order referred to as

"restitution" or "remedial compensation."  Consent Order at 5.[5]

Apparently, Debtors were identified by Wells Fargo as borrowers

entitled to a compensatory payment under the Consent Order.  After

learning that Debtors may be entitled to a payment under the Consent

Order,[6] in April 2015, the U.S. Trustee filed a motion to reopen Debtors'

bankruptcy case and to appoint a trustee to administer Debtors'

settlement claim, which had not been listed in Debtors' schedules.  Dkt.

No. 43.  The Court granted the motion, reopened the bankruptcy case, and

Trustee was appointed.  Dkt. Nos. 44, 45.

On July 31, 2015, Trustee filed a motion to approve a compromise

between Wells Fargo and the bankruptcy estate.  Mot. to Approve

Compromise, Dkt. No. 50.  In the motion, Trustee sought authority to

accept Wells Fargo's offer to pay him $8,120.23 (the "Payment") pursuant

---

[5] The Consent Order also required Wells Fargo to pay a "civil money penalty" to the government of $85 million.  Consent Order at 5.

[6] Motion to Reopen at ¶ 5.  It is unclear how the U.S. Trustee first learned about the Consent Order.

MEMORANDUM OF DECISION – 5

to the Consent Order in exchange for his execution of an "Acceptance of

Compensation and Release" releasing Wells Fargo from any potential

claims arising from its loan to Debtors. *Id.* at 2-3 and Exhibit A; Trustee

Status Report at ¶¶ 2-3, Dkt. No. 49.

Debtors objected to the compromise motion, arguing that, because

the Consent Order was entered post-bankruptcy, the Payment from Wells

Fargo under the Consent Order was not property of the estate. Thus, they

urged, Trustee was not entitled to settle any claim against Wells Fargo and

the compromise motion should be denied. Obj. to Mot. to Approve

Compromise at 1-2, Dkt. No. 53.

At a hearing on September 15, 2015, the Court granted the motion

and approved the compromise with Wells Fargo. However, in doing so,

the Court allowed the parties to reserve their rights to thereafter ask the

Court to determine if the Payment was property of the estate, and required

Trustee to hold the Payment in trust until the Court resolved whether it

was property of the bankruptcy estate. *See* Min. Entry, Dkt. No. 55; and

Order Granting Mot. to Approve Compromise, Dkt. No. 56 at ¶ 2. The

MEMORANDUM OF DECISION – 6

parties then submitted the Joint Motion.  Dkt. No. 60.

### *Issue*

To resolve the Joint Motion, the Court must decide whether the
Payment received by Trustee from Wells Fargo in accordance with the
post-bankruptcy Consent Order to resolve claims arising from Wells
Fargo's prebankruptcy lending practices is property of the estate.   The
Court concludes that the Payment is indeed property of this bankruptcy
estate for the reasons that follow.

### *Analysis and Disposition*

### I.

As a general rule, the Code provides that the bankruptcy estate
consists of "all legal or equitable interests of the debtor in property as of
the commencement of the case".  § 541(a)(1).  "The scope of the bankruptcy
estate is extremely broad, including both tangible and intangible
property."  *In re Pogrom*, 395 B.R. 692, 695 (Bankr. D. Idaho 2008) (citing
*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983).  But, the scope
of the estate is not so broad as to "expand a debtor's rights in property

MEMORANDUM OF DECISION – 7

over what existed as of the date of filing." *Id.* (quoting *Farmers Ins. Group v. Krommenhoek (In re Hiatt)*, 00.3 IBCR 131, 132 (Bankr. D. Idaho 2000).

Despite the temporal limitation in § 541(a)(1), property of the estate also includes certain kinds of property coming into existence after bankruptcy. For example, the estate will also include "[p]roceeds, product, offspring, rents, or profits from property of the estate" and "any interest in property that the estate acquires after the commencement of the case." § 541(a)(6), (a)(7).

"According to the legislative history of [§ 541(a)(6)], 'proceeds' is not to be defined as narrowly as in the Uniform Commercial Code." *In re Hyman*, 123 B.R. 342, 346 (9th Cir. BAP 1991) *aff'd*, 967 F.2d 1316 (9th Cir. 1992) (citing S.Rep. No. 989, 95th Cong.2d Sess. 82, (1978); H.R.Rep. No. 595, 95th Cong. 1st Sess. 368 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5868, 6323). The result is a meaning that is "exceedingly broad." *Id.* (citing *In re Calder*, 94 B.R. 200, 201 (Utah 1988).

Furthermore, "Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property

MEMORANDUM OF DECISION – 8

interests created with or by property of the estate are themselves property of the estate." *MacKenzie v. Neidorf*, 534 B.R. 369, 372 (9th Cir. BAP 2015) (quoting *TMT Procurement Corp. V. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 524-25 (5th Cir. 2014) and citing H.R. Rep. 95-595, 549, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6455 & 6523-24). Property acquired by the estate after commencement of the bankruptcy case is included in the estate under § 541(a)(7) if it was created with or by property of the estate; acquired in the estate's normal course of business; or is otherwise traceable to, or arises out of, any prepetition interest included in the bankruptcy estate. *Id.* at 372 (citations omitted).

As the party arguing that the Payment is property of the estate, Trustee bears the burden of proof. *Id.* (citations omitted).

## II.

Trustee argues that the Payment was made to him by Wells Fargo in accordance with the Consent Order, to compensate Debtors as borrowers who were subjected to Wells Fargo's prebankruptcy sharp lending practices. Because any claim by Debtors against Wells Fargo would have

MEMORANDUM OF DECISION – 9

arisen in 2007 when they received the loan, that claim would constitute

property of the estate under § 541(a)(1).  Since the Payment effected by the

Consent Order was clearly intended as compensation for Debtors' claim,

the Payment is also property of the estate under § 541(a)(7).  To support

his characterization of the purpose for the Payment, Trustee points out

that, as a condition of his receipt of the Payment, and with the approval of

the regulators, Wells Fargo required Trustee to release the lender from

"any and all claims relating to [Wells Fargo's] origination of a more

expensive mortgage loan [to Debtors] that the loan for which [they]

potentially qualified."  Acceptance of Compensation and Release at 2, Dkt.

No. 50 Exh. A; Trustee's Memo. at 2-4, Dkt. No 64.

　　　　Debtors contest Trustee's attempts to tie the Payment to

prebankruptcy events.  Instead, Debtors argue that the Payment is not

property of the estate because any right to receive it arose solely as a result

of the 2011 Consent Order, which was entered long after their 2009

bankruptcy case was commenced.  They note that there is no evidence that

Wells Fargo in fact engaged in any wrongful conduct regarding their

MEMORANDUM OF DECISION – 10

particular loan.  Debtors' Memo at 4, Dkt. No. 63.  In effect, Debtors argue

that they are merely the indirect beneficiaries of the government's

regulatory action, and they analogize these facts to those in cases involving

the post-bankruptcy enactment of legislation bestowing cash and other

benefits upon debtors, like fishermen and farmers, which rights or cash

awards the courts have decided were not property of the debtors'

bankruptcy estates.  *Id.* at 3-4 *citing In re Schmitz*, 270 F.3d 1254 (9th Cir.

2001)*; In re Vote*, 276 F.3d 1024 (8th Cir. 2002).

### III.

While the case law admittedly requires a close reading, the Court

concludes Trustee's position is the correct one.

The Consent Order and release documents make clear that the

Payment was intended to constitute compensation for any financial

detriment Debtors may have suffered as the result of having taken out a

nonprime loan from Wells Fargo in 2007, when they may have been

eligible for a cheaper, prime loan.  Put another way, the Payment was

intended to discharge any claim Debtors may have held against Wells

MEMORANDUM OF DECISION – 11

Fargo as a result of the loan transaction, a claim that would have existed at the time of their bankruptcy filing.

In addition to the compensatory nature of the Payment, the role played by the release is a critical factor in the Court's analysis in this case. Because Trustee was required to release potential claims against Wells Fargo in order to receive the Payment, if the Payment was property of the estate, the Payment is likewise property of the estate pursuant to either § 541(a)(6) or § 541(a)(7).

## A.

"Legal causes of action are included within the broad scope of § 541." *In re Goldstein*, 526 B.R. 13, 21 (9th Cir. BAP 2015) (citations omitted). This is true "even if the debtors were unaware of the claim when they filed for bankruptcy protection." *In re Michael*, 423 B.R. 323, 330 (Bankr. D. Idaho 2009). Also, a later recovery on a claim is derivative of the cause of action and therefore also property of the estate. *In re Brown*, 363 B.R. 591, 605 (Bankr. D. Mont. 2007) (citing *In re Smith*, 293 B.R. 786, 788 (Bankr.D.Kan.2003); *In re Ballard*, 238 B.R. 610, 624 (Bankr.

MEMORANDUM OF DECISION – 12

M.D. La. 1999).

The Consent Order explains the regulators' contentions concerning Wells Fargo's lending practices.  It alleges that it was Wells Fargo knowingly diverted borrowers away from the prime loans for which they may be qualified, and into more expensive and onerous nonprime loans,[7] without informing them of what was occurring.  Consent Order at 4-5.  The Consent Order alleged that Wells Fargo's conduct amounted to "unsafe or unsound banking practices" and constituted:

> [v]iolations of various state laws pertaining to fraud and false or misleading statements in home mortgage loan-related documents, and to unfair or deceptive acts or practices.

*Id.* at 5.

It is true that, as Debtors point out, in its agreement for entry of the Consent Order, Wells Fargo was not required to admit any specific wrongdoing, and there is no evidence in the record that, in particular, Debtors' transaction with Wells Fargo was tainted by Wells Fargo's

---

[7] Nonprime loans were offered to less-qualified borrowers at higher interest rates allegedly to offset the increased risk of nonpayment.

MEMORANDUM OF DECISION – 13

alleged unlawful conduct.[8]  Even so, that Debtors qualified for payment

under the Consent Order is evidence that they received a nonprime loan

when they were eligible for a prime loan,[9] and that they did so to their

financial detriment.[10]  This, coupled with the fact that the Consent Order

allowed Wells Fargo to require borrowers eligible to receive payments to

release the lender from any possible claims described in the factual

allegations,[11] persuades the Court that Debtors held a cause of action

---

[8] Consent Order at 6 (reciting that its entry was "without this Order constituting an admission by Wells Fargo . . . of any allegation made or implied . . . in connection with this matter. . . .").

[9] Consent Order at 17-19 (detailing borrower eligibility for cash payments).

[10] Consent Order at 17-20 (explaining calculations for remedial compensation for borrowers who paid interest and experienced damage to their credit).

[11] It is clear that, through the Consent Order, that Wells Fargo's payments to borrowers were intended to compensate them for any potential financial damages they had incurred as a result of borrowing from Wells Fargo, and that the consideration for the payments was the borrowers' agreement to release Wells Fargo from any further liability on account of its actions.  *See* Consent Order p. 21 (explaining that Wells Fargo was required to provide specimen copies of letters that will specify information or documents that borrower must provide in order to obtain the remedial compensation, including an appropriate form of release); Acceptance of Compensation and Release at 1-2, Dkt. No. 50.

MEMORANDUM OF DECISION – 14

against Wells Fargo based upon the loan transaction, even if that claim

was only potential or disputed.

## B.

"To determine when a cause of action accrues, and therefore

whether it accrued pre-bankruptcy and is an estate asset, the Court looks

to state law." *Goldstein*, 526 B.R. at 21 (citations omitted).  Here, a cause of

action for violation of the Idaho Consumer Protection Act would have

accrued when the Debtors' loan was originated.  *See* Idaho Code § 48-

608(1) (providing that accrual occurs when a person purchases services

and suffers an ascertainable loss that is the result of a practice declared

unlawful by the ICPA[12]); *In re Beach*, 447 B.R. 313, 319 (Bankr. D. Idaho

2011).

A cause of action for fraud, on the other hand, accrues when the

facts constituting the fraud are discovered by the aggrieved party.  Idaho

Code § 5-218(4); *Mason v. Tucker & Associates*, 871 P.2d 846, 852 (Idaho Ct.

---

[12] Engaging in any act or practice which is otherwise misleading, false, or
deceptive to the consumer is unlawful under the ICPA. Idaho Code § 48-603(11).

MEMORANDUM OF DECISION – 15

App. 1994).  However, "it is important to distinguish between accrual of

an action for purposes of ownership in a bankruptcy proceeding and

accrual for purposes of the statute of limitations." *In re Brown*, 363 B.R. at

605 (citing *Cusano v. Klein*, 264 F.3d 936, 947 (9th Cir. 2001); *see also In re*

*Endresen*, 530 B.R. 856, 863 (Bankr. D. Or. 2015).  For purposes of

determining when a cause of action is property of the estate, a claim

accrues when it "could have been brought." *Brown*, 363 B.R. at 605 (citing

*Cusano*, 264 F.3d at 947).  Under Idaho law, a claim for fraud accrues only

when nine elements are met.[13]  But since even the last of those elements,

injury, would have occurred in this case when Debtors began paying the

higher rate of interest on the loan, their cause of action for fraud would

have accrued prepetition as well.

    Therefore, although Wells Fargo disputed it, and it was unknown to

---

[13] "Nine elements must be proved to sustain an action for fraud: (1) a
statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of
its falsity; (5) the speaker's intent to induce reliance; (6) the hearer's ignorance of
the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely;
and (9) consequent and proximate injury." *Country Cove Dev., Inc. v. May*, 143
Idaho 595, 600, 150 P.3d 288, 293 (2006) (citing *Lettunich v. Key Bank Nat'l Ass'n*,
141 Idaho 362, 368, 109 P.3d 1104, 1110 (2005)).

MEMORANDUM OF DECISION – 16

Debtors at the time they filed their bankruptcy petition, as described in the

Consent Order and release documents, Debtors held a potential cause of

action against Wells Fargo arising from its dealings with them in 2007 for

the financial harm they may have suffered as a consequence of borrowing

from Wells Fargo.  Because the potential claims against Wells Fargo

existed at the time Debtors commenced the bankruptcy case, there were

property of the estate under § 541(a)(1).  And, because Trustee was

required to release those claims as a condition of receipt of the Payment,

those funds are also property of the estate either under § 541(a)(6) as

proceeds from the potential causes of action, or under § 541(a)(7), because

the Payment is traceable to, and arose out of, property of the estate.

### IV.

The Court's conclusion is not inconsistent with other case law.

For example, in *Neidorf*, a secured creditor obtained stay relief on a

chapter 7 debtor's home and foreclosed.  *Id.* at 371.  Almost six years later,

MEMORANDUM OF DECISION – 17

while the estate was still open,[14] the debtor received a payment pursuant
to a national settlement between banking regulators and certain financial
institutions based upon their alleged improper foreclosure practices.  *Id.*
The chapter 7 trustee filed a motion for turnover of the payment arguing
that it was property of the estate pursuant to § 541(a)(7) because the
payment arose from the debtors prepetition interest in the residence that
was the subject of the foreclosure.  *Id.*  In holding that the payment was not
property of the estate, the BAP stated:

> Here, Trustee has not shown how the bankruptcy estate
> acquired an interest in the postpetition Foreclosure Payment.
> *The payment was neither created with or by property of the estate*
> *nor can it be said that the payment is traceable to or arose out of any*
> *prepetition interest included in the bankruptcy estate.* The fact that
> Debtor's Residence became property of the estate, in and of
> itself, does not support the inclusion of the Foreclosure
> Payment as after-acquired property under § 541(a)(7).  Rather, Debtor
> became entitled to the payment only as a result of qualifying events
> occurring after her bankruptcy filing.
>
> Debtor's legal right to, or interest in, the Foreclosure Payment
> was as a "borrower," and did not arise until [the consent
> order was entered]. . . .  Under the [consent order] only

---

[14] The trustee had kept the estate open to collect on an unsecured note.
*Neidorf,* 534 B.R. at 371.

MEMORANDUM OF DECISION – 18

borrowers who had a pending or completed foreclosure on
their primary residence any time from January 1, 2009, to
December 31, 2010, were eligible to receive distributions from
the QSF.  In other words, it was the postpetition [consent
order] which created the rights and remedies for the specified
class of borrowers.

*Nowhere has Trustee shown how the estate obtained an interest in
the Foreclosure Payment itself when the qualifying events giving
rise to Debtor's legal rights to the payment all occurred postpetition
and were held solely by the borrowers. See Drewes v. Vote (In re
Vote), 276 F.3d 1024 (8th Cir.2002).*

*In re Neidorf*, 534 B.R. 369, 372 (B.A.P. 9th Cir. 2015) (emphasis added).

Here, in order to receive the Payment, Trustee was required to

execute a release of the potential claims that had inured to the estate as of

the filing of the petition.  Because of this, Trustee has shown, as the trustee

in *Neidorf* could not, that the Payment is traceable to and arose from a

prepetition interest in the bankruptcy estate.  Moreover, the post-

bankruptcy Consent Order alone did not create Debtors' right to the

Payment.  While the Consent Order provided a framework to identify the

parties eligible for the payment, and how to calculate those payments,

Trustee did not have a right to the payment until he released the estate's

MEMORANDUM OF DECISION – 19

potential claims against Wells Fargo.  The release further evidences that

the Payment is proceeds from the potential causes of action, and the right

to the Payment arose from Debtors' prepetition interest in the potential

causes of action.   *Neidorf* is distinguishable.

The release requirement in this case also differentiates it from *In re*

*Vanwart*, 497 B.R. 207 (E.D.N.C. 2013).  In *Vanwart*, the debtors received a

payment pursuant to a consent order entered postpetition against a lender

who had attempted to foreclose on the residence prepetition.  In holding

that the payment was not property of the estate, the bankruptcy court

stated that:

> Although the debtors' qualification to receive the payment is
> based upon the first foreclosure action . . . the payment was
> not sufficiently rooted in that action as to render the payment
> property of the estate.  While a bankruptcy estate includes
> "causes of action" belonging to the debtor at the time the case
> is commenced, *In re Hamlett*, 304 B.R. 737, 740
> (Bankr.M.D.N.C.2003), that analysis is inapplicable here
> because there is no indication that the debtors were
> wrongfully foreclosed upon or have some other cause of
> action against SunTrust Mortgage.  The 2013 consent order
> and the letter the debtors received with the payment explicitly
> state that the payment is in no way an admission of liability or
> wrongdoing on SunTrust Mortgage's behalf, *nor does*

MEMORANDUM OF DECISION – 20

> *acceptance of the payment by the debtors foreclose their ability to
> bring a cause of action against SunTrust Mortgage*. Furthermore,
> the foreclosure action which made the debtors eligible . . . was
> voluntarily dismissed without prejudice.  The actual
> completed foreclosure . . . did not occur within the dates
> targeted by the enforcement action . . . . Neither of the
> foreclosure actions have been alleged to have been deficient in
> any manner.

*Vanwart*, 497 B.R. at 212 (emphasis added).  While the Consent Order in

this case is also not an admission of any wrongdoing by Wells Fargo,

unlike in *Vanwart*, Trustee was indeed required to release any potential

claims against the lender to obtain the Payment.  In contrast, the consent

order in *Vanwart* stated, "In no event shall [lender] request or require any

borrower to execute a waiver of any claims against [lender] in connection

with any payment [provided pursuant to] this Order."  *Id.* at 210.  Because

a release was required here, *Vanwart* is also inapposite.

Finally, *Schmitz* and *Vote* do not help Debtors.  As the Ninth Circuit

BAP observed in *Goldstein*,[15] "[i]n both cases, the rights under review, crop

---

[15] In *Goldstein*, the BAP held that debtors' claim against its mortgage
lender was a prepetition cause of action even though the judicial decisions
recognizing debtors' right to assert that cause of action were issued postpetition.
526 B.R. 13.

MEMORANDUM OF DECISION – 21

disaster assistance and fishing rights . . . were created postpetition by legislation enacted postpetition.  *In re Vote* 261 B.R. at 442; *In re Schmitz*, 270 F.3d at 1255-56."  526 B.R. at 23.  For example, while the fishing quota rights in *Schmitz* were based on the Debtor's pre-filing catch history, it was not until the regulations were promulgated postpetition that fishermen obtained any future fishing quota rights.  *Schmitz*, 270 F.3d at 1255.  Because of this, the Ninth Circuit reasoned, "as of the date of the petition, Schmitz's [prepetition] catch history had no value."[16]

Here, Debtors' claims against Wells Fargo were "based on common law causes of action and other legislation that were already in place" and "did not require enactment of new legislation." *Goldstein*, 526 B.R. 23.  Thus, unlike the debtors' fishing history in *Schmitz,* or the crop loss in *Vote*, Debtors' prepetition right to prosecute a claim against Wells Fargo had value and was property of the estate.  As such, when Trustee was required to release that right in exchange for the Payment, the Payment became part

---

[16]  The 8th Circuit BAP similarly explained in *Vote* that, "[w]e have found no case in which a pure loss with no attendant potential benefit was included as property of the estate." *Vote*, 276 F.3d at 1027.

MEMORANDUM OF DECISION – 22

of the estate.  In other words, "both [ *Schmitz* and *Vote* are factually and legally distinguishable."[17]  *Id.*

### Conclusion

While the issue is a close one, for these reasons, the Court concludes that the Payment is property of the estate.  The parties shall submit an approved form of order for entry by the Court.

Dated:  March 10, 2016

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

---

[17] While not cited by Debtors, for these same reasons, the decisions in *Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 499 (5th Cir. 2006), and *Bracewell v. Kelley (In re Bracewell)*, 454 F.3d 1234 (11th Cir. 2006) are also distinguishable.

MEMORANDUM OF DECISION – 23

Appellee Record - 77

# Tab 6

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

In Re:

Porrett, Gary & Jennifer,

                            Debtors.

Case No. 09-03881-JDP

Chapter 7

**Order Regarding Joint Motion for Determination of
Property of the Bankruptcy Estate**

      This matter came before the Court on the Joint Motion for Determination of Property of the Bankruptcy Estate (the "Motion") (Dkt. No. 59) filed on January 20, 2016 by Noah Hillen (the "Trustee"), the chapter 7 trustee for the above-captioned case, and Gary and Jennifer Porrett (the "Debtors"), requesting a determination whether $8,120.23 (the "Payment") held by the Trustee is property of the bankruptcy estate.

      The Court having considered the Motion, the stipulated facts, briefs, and arguments of counsel at the February 23, 2016 hearing, and after due deliberation and consideration and sufficient cause appearing therefor,

      IT IS HEREBY FOUND AND CONCLUDED that:

      A.    The Court's findings of fact and conclusions of law as set forth in the Memorandum Decision (Dkt. No. 68) are hereby incorporated by reference.

      B.    The Payment is property of the bankruptcy estate.

//end of text//

Dated: March 17, 2016

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge


Order submitted by Noah Hillen, Chapter 7 Bankruptcy Trustee.


APPROVED AS TO FORM AND CONTENT ON MARCH 16, 2016:


/s/ _____
Patrick J. Geile
FOLEY FREEMAN, PLLC
Counsel for Debtors